2006 WY 120

**Robert Edward ROHDA, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. 03–201.**

Supreme Court of Wyoming.

Sept. 27, 2006.

Representing Appellant: Kenneth M. Koski, State Public Defender; Donna D. Domonkos, Appellate Counsel. Argument by Ms. Domonkos.

Representing Appellee: Patrick J. Crank, Wyoming Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Daniel M. Fetsco, Assistant Attorney General. Argument by Mr. Fetsco.

Before VOIGT, C.J., and GOLDEN, HILL,* and KITE, JJ., and STEBNER, D.J., Retired.

GOLDEN, Justice.

[¶ 1] Appellant Robert Edward Rohda was charged with violations of state drug laws after state law enforcement officers executing a search warrant discovered marijuana in a shed on Rohda's residential property in Buffalo, Wyoming. The search warrant was issued by a district court commissioner who had determined the existence of probable cause on the strength of an affidavit signed under oath by a special agent of the state division of criminal investigation. The affidavit included hearsay statements of other law enforcement personnel and three confidential informants. Before trial, Rohda moved to suppress evidence seized during the search, asserting that the affidavit was insufficient to establish probable cause as required under both Article 1, Section 4 of the Wyoming Constitution and the Fourth Amendment of the United States Constitution. After a hearing on Rohda's motion, the district court that reviewed the district court commissioner's probable cause determination denied the motion. Rohda then entered a conditional guilty plea to one count of felony possession of marijuana, reserving his right to appeal the district court's order denying his motion to suppress. Pending this appeal, execution of Rohda's sentence was stayed, and Rohda was released on bond.

[¶ 2] Rohda and the State agree that the single issue for this Court's review, as it was for the district court at the suppression hearing, is the district court commissioner's probable cause determination.[1] For reasons expressed more fully below, this Court holds that that determination was correct. Consequently, this Court affirms Rohda's judgment and sentence and remands this case to the district court with directions to take appropriate action in light of this decision.

## STANDARD OF REVIEW

### The Appellate Standard of Review

[¶ 3] This Court's standard of review applicable to probable cause determinations based on search warrant affidavits is well-known and need not be repeated here at great length. See, e.g., TJS v. State, 2005 WY 68, 113 P.3d 1054 (Wyo.2005); Page v. State, 2003 WY 23, 63 P.3d 904 (Wyo.2003); Kitzke v. State, 2002 WY 147, 55 P.3d 696 (Wyo.2002); Bonsness v. State, 672 P.2d 1291 (Wyo.1983); Massachusetts v. Upton, 466 U.S. 727, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984) (per curiam); Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

[¶ 4] The duty of reviewing courts is simply to ensure that the warrant-issuing judicial officer had a substantial basis for concluding that probable cause existed. As both our Court and the United States Supreme Court have recognized, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants. See, e.g., Upton, 466 U.S. at 732–33, 104 S.Ct. at 2088; Gates, 462 U.S. at 236, 103 S.Ct. at 2331; Page, ¶ 9, 63 P.3d at 909; and Davis v. State, 859 P.2d 89, 94 (Wyo.1993).

### The Warrant–Issuing Judicial Officer's Standard for Determining Probable Cause

[¶ 5] The judicial officer who is presented with an application for a search warrant supported by an affidavit applies a

---

* Chief Justice at time of oral argument

1. The State raised the "good faith" exception of *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), as a fall-back issue in case this Court reversed the district court commissioner's probable cause determination. Because of our decision, we shall not address that issue.

"totality of circumstances" analysis in making an independent judgment whether probable cause exists for the issuance of the warrant. *See, e.g., Page,* ¶ 9, 63 P.3d at 909; *Upton,* 466 U.S. at 732, 104 S.Ct. at 2087; and *Bonsness,* 672 P.2d at 1293. In making that independent judgment, the judicial officer is limited to the four corners of the supporting affidavit. *Page,* ¶ 9, 63 P.3d at 909. The "totality of circumstances" analysis requires the judicial officer simply "to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates,* 462 U.S. at 238, 103 S.Ct. at 2332; *see Bonsness,* 672 P.2d at 1293.

■■ [¶ 6] The hearsay provider's "veracity" and "basis of knowledge" were the prongs of the "two-pronged test" established in *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). *See, e.g.,* Charles E. Moylan, Jr., *Hearsay and Probable Cause: An Aguilar and Spinelli Primer,* 25 Mercer L.Rev. 741 (1974). This Court "never specifically adopted," and in fact rejected "the technical and rigid requirements" set out in *Aguilar* and *Spinelli. Bonsness,* 672 P.2d at 1293. In 1983, when the United States Supreme Court in *Gates* rejected those technical and rigid requirements, it realized, as our Court had, that the "totality of circumstances" approach was more in keeping with the practical, common sense decision required of the warrant-issuing judicial officer. *Upton,* 466 U.S. at 732, 104 S.Ct. at 2087. The warrant-issuing judicial officer does not measure the affidavit by a "reasonable doubt" standard or a "preponderance of evidence" standard; instead, the measure is that the circumstances set forth in the affidavit must amount to more than a mere suspicion yet need not rise to the level of prima facie evidence of guilt. *Lee v. State,* 2 P.3d 517, 523 (Wyo.2000).

■■ [¶ 7] An appropriate set of guidelines for the "totality of circumstances" approach can be derived from United States Supreme Court cases, our Wyoming cases, and the work of respected commentators[2] who have reviewed federal and state case law in this area. The judicial officer deciding whether probable cause exists relies on information coming to him from the outside world. The primary source of that information is a law enforcement officer who is applying for the warrant and has signed under oath an affidavit in support of the application. The affiant law enforcement officer may include in his affidavit the raw data of his own sense perception, that is, what he saw, heard, or smelled firsthand. This firsthand information constitutes the affiant's basis of knowledge—how he acquired his information. From affiant's firsthand information, the judicial officer may draw conclusions about the existence or not of probable cause. With respect to the affiant's veracity or reliability, the judicial officer relies on the affiant's oath, with its sanctions of perjury, which is an integral part of the affiant's affidavit.

■■ [¶ 8] Frequently, the affiant includes in his affidavit information acquired from secondary sources in the persons of other law enforcement officers or confidential informants. As in the case of the primary source affiant, so in the case of the secondary source person, the judicial officer must know both that person's veracity or reliability and basis of knowledge. Because the secondary source person is not before the judicial officer and has not taken an oath, the judicial officer must have a reasonable substitute for an oath in order to be satisfied with the veracity or reliability of the secondary source person. When the secondary source person is a law enforcement officer, courts hold that such an officer is presumed truthful or reliable and, therefore, no special showing of veracity or reliability is necessary. That rule applies not only to law enforcement officers in the same organization as the affiant, but also to those in different

---

2. 2 Wayne R. LaFave, *Search and Seizure* § 3.3, at 97–202 (4th ed.2004); Yale Kamisar, *Gates, "Probable Cause," "Good Faith," and Beyond,* 69 Iowa L.Rev. 551 (1984); and Charles E. Moylan, Jr., *Illinois v. Gates:* What It Did and What It Did Not Do, 20 Crim. L. Bull. 93 (1984).

organizations at local, state, or federal levels. When the secondary source person is a confidential informant, the veracity or reliability requirement is usually met by the recitation in the affiant's affidavit by either the primary source affiant or the secondary source law enforcement officer of previous instances in which the law enforcement officer obtained information from the confidential informant that led to arrests or convictions. In the absence of such a recitation, an acceptable substitute recognized by courts is the confidential informant's admission of activities against his penal interests contained in the information provided. With respect to the secondary source person's basis of knowledge, the affiant's affidavit must contain the raw data of that person's sense perception—what that person saw, heard, or smelled firsthand. It is from that secondary source's firsthand knowledge that the judicial officer will be able to draw conclusions about the existence or not of probable cause. If the affidavit fails to show how the secondary source person acquired his information, courts have applied the notion of "self-verifying detail" to cure such a failure. Simply stated, the secondary source person's information is considered "self-verifying" if it describes the warrant-target's criminal activity in such sufficient detail that the judicial officer reasonably may know that he is relying on information more substantial than a casual rumor or an accusation based merely on general reputation.

[¶ 9] Mindful of our standard of review and of the above and foregoing guidelines for the "totality of circumstances" approach, we are ready to review whether the warrant-issuing district court commissioner had a substantial basis in the affidavit to make a practical, common sense determination that there was a fair probability that evidence of a crime would be found on Rohda's residential property.

## DISCUSSION

[¶ 10] We begin our review by setting out in full the affidavit in issue signed under oath on April 18, 2002, by Special Agent Loy Young of the Wyoming Division of Criminal Investigation and submitted to the district court commissioner in support of the application for a search warrant:

1. The Affiant is a Special Agent for the Wyoming Division of Criminal Investigation, assigned to the Northeast Enforcement Team and is a peace officer as defined in Wyoming State Statutes 9–1–611(a) and 9–1–611(b)(iv) and Wyoming Statute 7–2–101(a)(iv)(D) and is thus accorded the power and authority of an agent, as defined in Wyoming State Statute 9–1–618(b)(ii), which provides in pertinent part that the "... Division (and its Agents) shall investigate suspected violations of the Wyoming Controlled Substance Act of 1971, 35–7–1001 et seq., and (shall) perform all the duties of a law enforcement officer under this act."

2. The Affiant was employed by the Casper Police Department for six years previous to his appointment to the position as Special Agent for the Wyoming Division of Criminal Investigation. The Affiant was assigned to the Division of Criminal Investigation's Central Enforcement Team (CEET) for over three years during that time. For two years prior to the Affiant's employment with the Casper Police Department, the Affiant was a patrol deputy for the Lincoln County Sheriff's Office in Kemmerer, Wyoming. The Affiant also spent six months as a correctional officer at Nevada's maximum security prison. The Affiant has been involved in the investigation of both state and federal controlled substance violations, including street level undercover purchases, execution of search warrants, major level conspiracy investigations and domestic marijuana growing operations. The Affiant has made numerous arrests for controlled substance violations, which have resulted in both misdemeanor and felony convictions in state and federal courts.

3. The Affiant has received training related to the investigation of controlled substance violations from the Wyoming Division of Criminal Investigation, the Wyoming Law Enforcement Academy, the United States Drug Enforcement Administration and the Nevada Division of Investigation. The training has covered

subjects ranging from simple drug identification to major drug conspiracy investigations.

4. Based upon the above the Affiant knows the following:

a. That controlled substance traffickers/distributors often maintain "residences", or locations such as commercial storage facilities, which are used as stash houses, for controlled substance storage and distribution;

b. That often times controlled substance traffickers/distributors maintain on hand large amounts of U.S. Currency in order to finance their ongoing controlled substance business;

c. That controlled substance traffickers/distributors often maintain items such as driver's licenses, phone bills, rent receipts, checks, canceled mail envelopes, utility bills, ledgers and personal written or electronic diaries, which are commonly used to help identify the person or persons responsible for a crime, and used in court during the prosecution of those persons;

d. The controlled substance traffickers/distributors maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other documents relating to the transportation and distribution of controlled substances;

e. That controlled substance traffickers/distributors commonly maintain address or telephone number books and documents which reflect names, addresses and/or telephone numbers of their associates in the trafficking/distribution organization;

f. That controlled substance traffickers/distributors who have access to a computer system, often use this computer to maintain records, receipts, notes, etc., of their illegal enterprise;

g. That it is common for controlled substance traffickers/distributors to conceal proceeds from the distribution of controlled substances and/or records of locations of proceeds as well as contraband within their residences;

h. That controlled substance traffickers/distributors take or cause to be taken photographs of themselves, their associates, their property and their product, and the photographs are usually maintained at their residences;

i. That based on my training and experience, I know that controlled substance traffickers/distributors often use safes and other such items to store controlled substances, currency and other assets;

j. That when executing search warrants at the residences or "stash locations" of controlled substance traffickers/ distributors, it is common to find person(s) in or on the premises. Often times those person(s) are found to be in possession of controlled substances, large amounts of United States Currency and/or other evidence of controlled substance violations;

k. That based on my training and experience, I know that controlled substance traffickers/distributors have in their possession or control, firearms, including but not limited to handguns, rifles, shotguns, machine guns and other weapons and that the weapons are used to protect and secure a controlled substance trafficker/distributor;

l. That controlled substance traffickers/distributor[s] commonly travel to purchase and distribution areas to facilitate their trafficking; that after purchasing controlled substances, the traffickers/distributors will transport or cause to be transported, controlled substances to the distribution areas; and that the methods of transportation include, but are not limited to rental and private automobiles, and that items of evidence are often times found in automobiles utilized by drug traffickers/distributors;

5. On January 18, 2002, a Confidential Source, hereinafter referred to as CS–1, provided information that Robert Edward ROHDA (DOB: 09/14/1947) was involved with local outlaw motorcycle clubs and was closely tied to marijuana and methamphetamine shipments into Wyoming. CS–1 also reported that ROHDA had recently opened a business, in Buffalo, Wyoming, selling Amish and Mennonite furniture, which was being trucked in from the eastern United States.

6. DCI Criminal Intelligence Analyst, Al Ehrhardt, conducted research into ROHDA's background and found that ROHDA originated from the state of Wisconsin. CIA Ehrhardt found that ROHDA still had family ties in the Cashton, Wisconsin area. The records CIA Ehrhardt located, indicated that ROHDA moved to Buffalo, Wyoming, in July of 2001, and established a business selling Amish and Mennonite furniture.

7. On January 25, 2001, DCI Intelligence Analyst, Al Ehrhardt, spoke with Wisconsin DCI Narcotics Agent, Dean Nickles. SA Nickles provided the following information:

a. In December of 1999, Wisconsin DCI concluded a case involving a very large marijuana grow operation, in which Robert Edward ROHDA was involved.

b. ROHDA started the marijuana grow operation by contacting a Wisconsin farmer named Roth. ROHDA provided Roth with marijuana seeds, which ROHDA had purchased in Amsterdam, and ROHDA and Roth began an indoor marijuana growing operation inside Roth's barn. The operation involved in excess of 4000 marijuana plants, which yielded 7–10 pounds of marijuana buds each week. During the time that the grow operation was in progress, Roth was doing most of the growing and harvesting and ROHDA was handling marijuana sales.

c. ROHDA assisted Wisconsin DCI with the case and was not prosecuted. Roth is currently serving a long prison sentence.

d. ROHDA's nephew was a member of the St. Paul, Minnesota, chapter of the Hell's Angels. During ROHDA's involvement in the marijuana growing operation, ROHDA would frequently drop his nephew's name in order to frighten associates into doing what ROHDA wanted.

8. On April 18, 2002, your Affiant conducted a Wyoming Driver's License records check on Robert E. ROHDA (DOB: 09/14/47), the records check indicated that ROHDA had a Wyoming Driver's License (DL# 107490–534). The address listed on the driver's license was 57 Foothills Ln., Buffalo, Wyoming. The driver's license

records indicated that ROHDA was 5'08" tall, weighed 145 pounds, had green eyes and brown hair. The driver's license records listed a Social Security Number of 471–52–9380.

9. On March 20, 2002, Sheridan DCI Agents, Forsythe and Quarterman, conducted an interview with a Confidential Source of information, hereinafter referred to as CS–2. CS–2 provided the following information:

a. During the first part of February 2002, CS–2 met an individual named Nathan MITCHELL, at he [sic] Ladore Bar in Story, Wyoming. CS–2 heard from other individuals that MITCHELL was a distributor of cocaine.

b. Approximately 3–4 weeks prior to March 20, 2002, MITCHELL was at he [sic] Ladore in Story, Wyoming, and CS–2 saw MITCHELL in possession of cocaine. CS–2 stated that MITCHELL was in possession of 3 "8–Balls", which is the street term used for one-eighth ounce. On that occasion, CS–2 used some of the cocaine with MITCHELL. CS–2 also purchased one-quarter gram of cocaine from MITCHELL. CS–2 discribed[described] the cocaine as being good quality cocaine.

c. Approximately one week prior to March 20, 2002, MITCHELL went on a trip to obtain more cocaine. MITCHELL returned to Wyoming with 9 ounces of cocaine and some marijuana.

d. On March 17, 2002, CS–2 obtained information that MITCHELL had been arrested in Gillette, Wyoming, for DUI and possession of a controlled substance.

e. CS–2 stated that MITCHELL drove a blue flatbed truck.

10. On April 18, 2002, your Affiant obtained a copy of a Campbell County Sheriff's Department report, which indicated that Nathan Davis MITCHELL (DOB: 02/04/73) was arrested near milepost 125 on I–90 on March 17, 2002. The report further indicated that MITCHELL was arrested for Driving Under the Influence, possession of marijuana and possession of cocaine.

11. On April 18, 2002, your Affiant conducted a Wyoming Driver's License records check on Nathan MITCHELL. The check indicated that MITCHELL had a Wyoming Driver's License (DL# 107417-099). The driver's license records listed a Social Security Number for MITCHELL of 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. The records also indicated that MITCHELL was previously licensed in the state of Minnesota.

12. On April 18, 2002, your Affiant spoke with FBI Agent Bonnie Wilson, who is assigned to the Casper, Wyoming, FBI Office. Agent Wilson informed your Affiant, that on April 18, 2002, she had talked with an FBI Confidential Source of information, hereinafter referred to as CS-3. Agent Wilson stated that CS-3 had provided reliable information to the FBI in the past, which had resulted in arrests made by the FBI and other Federal Agencies. On April 18, 2002, CS-3 provided the following information to Agent Wilson, who provided the information to your Affiant.

a. Bob ROHDA and Nathan MITCHELL returned to Buffalo, Wyoming, from Wisconsin, on April 17, 2002. ROHDA and MITCHELL were in possession of ten pounds of marijuana and 4 ounces of methamphetamine. ROHDA and MITCHELL were in ROHDA's red Ford pick-up truck. Both ROHDA and MITCHELL were high.

b. ROHDA and MITCHELL went to Mahoney's Storage, in Buffalo, Wyoming, upon their return.

c. CS-3 stated that marijuana and methamphetamine are being concealed at ROHDA's residence and/or in a shed on ROHDA's property and possibly in a storage unit at Mahoney's Storage.

13. On April 18, 2002, SA L. Williams conducted surveillance in the area of ROHDA's business, Amish Furnishings, located at 76 South Main, Buffalo, Wyoming. SA Williams observed a red Ford pick-up truck in the area, with license plate 16-4231. On April 18, 2002, your Affiant checked registration records, which indicated that 16-4231 was a 1998 red Ford pick-up truck, registered to Robert E. ROHDA, with an address of 57 Foothills Lane, Buffalo, Wyoming.

14. On April 18, 2002, SA Williams contacted the Buffalo, Wyoming, Criminal Justice Center, and obtained a copy of a questionnaire completed by ROHDA, for his business, Amish Furnishings. The questionnaire listed ROHDA's home telephone number as 684-7408. On April 18, 2002, your Affiant contacted U.S. West and found that telephone number (307) 684-7408 is installed at 57 Foothills Lane, Buffalo, Wyoming. The name of the subscriber was unavailable.

15. On April 18, 2002, SA Williams and Deputy Kozisek, contacted Mahoney's Storage and found that ROHDA was the renter of storage unit # 109. Mahoney's Storage is located on North Bypass Road, Buffalo, Wyoming.

16. Based upon the given information, your Affiant has probable cause to believe that at 57 Foothills Lane, Buffalo, Wyoming, Mahoney's Storage, Unit # 109, North Bypass Road, Buffalo, Wyoming, in a 1998 red Ford pick-up truck, registered to Robert E. ROHDA, bearing Wyoming license plate 16-4231, and on the person of Robert Edward ROHDA is evidence to show that a crime was committed. That evidence being, controlled substances, including but not limited to, marijuana and methamphetamine, paraphernalia for the cutting, packaging and the use of methamphetamine, included but not limited to, scales, papers, cutting agents, baby bottle liners, items of identification of possession of said evidence, including but not limited to, drivers licenses, rent receipts, checks, cancelled mail envelopes, phone bills, utility bills, personal written and electronic diaries, ledgers, cash and firearms.

17. Therefore, the Affiant pray the above-entitled Court to issue a search warrant for the said premises for the said property.

■■■ [¶ 11] It is helpful to our review first to unpack the affidavit and place its sixteen substantive paragraphs into several distinct categories. This is simply a first step in a totality of circumstances approach, done only for the purpose of distilling the gross product into that net evidence which is truly material to the probable cause determi-

nation. We fully understand that, under the totality of circumstances approach, the warrant-issuing judicial officer as well as the courts reviewing the judicial officer's probable cause determination must consider all of the material evidence together, and not in piecemeal fashion.

[¶ 12] In the first category, which comprises paragraphs one through four and sixteen of the affidavit, we place affiant Special Agent Young's firsthand knowledge of his current and past employment and peace officer status under Wyoming law; his training and experience in the investigation and detection of controlled substances crimes; his acquired knowledge about how drug traffickers/distributors operate, record, and maintain their criminal activities; and his opinion, based on the content of the substantive paragraphs of his affidavit, that he has probable cause to believe that at Rohda's residential property, and other specific locations, will be found drugs, including marijuana and methamphetamine, drug records, and other evidence incidental to such criminal activity.

[¶ 13] In a second category, which comprises paragraphs five, nine, and twelve of the affidavit, we place the hearsay evidence acquired from three confidential informants. In a third category, which comprises paragraphs six, seven, and thirteen through fifteen, we place hearsay evidence from several law enforcement officers. In a fourth category, which comprises paragraphs eight, ten, eleven, and parts of paragraphs thirteen and fourteen, we place Special Agent Young's firsthand knowledge of personal information about Rohda and one Nathan Mitchell.

[¶ 14] Having unpacked the affidavit and categorized its substantive paragraphs, we examine the parties' respective contentions. We shall begin with the second category, then consider, in order, the third, fourth, and first categories.

 [¶ 15] Rohda's challenge to the sufficiency of the affidavit to establish probable cause focuses primarily, but not exclusively, on the second category which comprises paragraphs five, nine, and twelve. Those paragraphs contain the hearsay evidence acquired from three confidential informants. We consider each confidential informant in

turn. The first confidential informant, CS–1, is the subject of paragraph five. Rohda contends, and the State concedes, the statement that on January 18, 2002, this informant "provided information that [Rohda] . . . was involved with local outlaw motorcycle clubs and was closely tied to marijuana and methamphetamine shipments into Wyoming . . . [and] had recently opened a business, in Buffalo, Wyoming, selling Amish and Mennonite furniture" is a barebones conclusion unsupported by underlying facts establishing the informant's veracity or reliability and basis of knowledge. We agree. *Bonsness*, 672 P.2d at 1293. A barebones conclusion like this does not assist a warrant-issuing judicial officer making a probable cause determination.

 [¶ 16] With respect to the confidential informant of paragraph nine (CS–2), who was interviewed by two of affiant Young's fellow agents a month before affiant Young signed and submitted his affidavit, Rohda contends that his reliability is not disclosed but does not challenge the basis of this informant's knowledge about Nathan Mitchell's controlled substances criminal activity, yet asserts that such knowledge does not pertain to Rohda or Rohda's possible criminal activity. In response, the State notes that this informant's statements demonstrate a firsthand knowledge of Nathan Mitchell's controlled substance criminal activity and constitute admissions against the informant's penal interest. As we explained earlier when setting out an appropriate set of guidelines for the "totality of circumstances" approach, the absence of a recitation of an informant's veracity or reliability based upon previous instances of providing accurate information to law enforcement may be cured by an informant's admission of activities of the type in question against that informant's penal interest. Consequently, Rohda's challenge to this second informant's reliability fails in light of these admissions against penal interest concerning controlled substances activities. In response to Rohda's assertion that this informant's evidence does not pertain to him or his possible criminal activity, the State appropriately observes that this evidence becomes significant when considered in light of the evidence supplied in paragraph twelve by

the third informant which places Rohda and Nathan Mitchell together on April 17, 2002, the day before affiant Young signed and submitted his affidavit. We will say more about that significance later.

[¶ 17] With respect to the confidential informant of paragraph twelve (CS–3), Rohda contends the information in that paragraph supplied by affiant Young fails to establish both that informant's veracity or reliability and basis of knowledge of Rohda's and Nathan Mitchell's alleged criminal activity. Rohda also complains that (1) the informant's information was provided to FBI Agent Wilson "at some unspecified time;" (2) FBI Agent Wilson "apparently relayed [the informant's] information to the affiant [Special Agent Young];" (3) FBI Agent Wilson did not "affirm under oath" that this third informant was reliable. In response, the State contends that Rohda's question about the informant's veracity or reliability is answered by FBI Agent Wilson's statement that the informant "had provided reliable information to the FBI in the past, which had resulted in arrests made by the FBI and other Federal Agencies." The State also dismisses Rohda's "basis of knowledge" contention when it points out the specific detail in the informant's account to FBI Agent Wilson: on a specific day, April 17, 2002, Rohda and Mitchell returned to Buffalo from Wisconsin, were in possession of specific quantities of marijuana (ten pounds) and methamphetamine (four ounces), were high, were riding in Rohda's red Ford truck, went to Mahoney's Storage, and were concealing marijuana and methamphetamine at Rohda's residence, a shed on Rohda's property, and possibly in a storage unit at Mahoney's Storage. We agree with the State that Rohda's various contentions are without merit.

[¶ 18] About the third informant's veracity or reliability, as noted in our earlier discussion of the appropriate set of guidelines for the "totality of circumstances" approach, the veracity or reliability requirement is usually met by a recitation, like the one here, by either the affiant or a secondary source law enforcement officer, like FBI Agent Wilson here, that the informant's information led to arrests on previous occasions. *See, e.g.,* 2

Wayne R. LaFave, *Search and Seizure* § 3.3(b), at 118–120 (4th ed.2004). It must also be noted here that FBI Agent Wilson herself is presumed to be truthful or reliable so that no special showing of her truthfulness or reliability in this instance is necessary. Id., § 3.5(a), at 269–271.

[¶ 19] About the third informant's basis of knowledge, the State is correct to point to the specific detail of the informant's information. As we noted earlier in our appropriate set of guidelines review, courts have recognized and applied the notion of "self-verifying detail" to cure an affiant's failure to show how the informant obtained the information. We reiterate that the informant's information is considered "self-verifying" if it describes the criminal activity of the warrant target, here Rohda, in sufficient detail that the judicial officer reasonably may know that he or she is relying on something more substantial than a casual rumor or an accusation based merely on general reputation. In this instance, the third informant's information contains such sufficient detail: on April 17, 2002, Rohda and Mitchell returned to Buffalo after being in Wisconsin, were in possession of specific quantities of specific controlled substances, were riding in Rohda's red Ford truck, and both were high. The judicial officer reasonably may infer that such specific detail is the product of the informant's eyewitness observation, *i.e.,* firsthand knowledge. That the informant talked to FBI Agent Wilson on April 18, 2002, puts to rest Rohda's contention that this information was provided "at some unspecified time." That affiant Special Agent Young states he spoke to and was told by FBI Agent Wilson what the informant's information was puts to rest Rohda's contention that Wilson "apparently relayed" the information. Both law enforcement agents are presumed truthful or reliable. Rohda's contention that FBI Agent Wilson did not "affirm under oath" the informant's veracity or reliability is put to rest by court decisions that recognize the presumption of such an agent's truthfulness or reliability. LaFave, *supra,* § 3.5(a), at 269–71. Finally, Rohda's contention that FBI Agent Wilson did not claim to have personal knowledge of the informant's veracity or reliability is directly undercut by the "fellow officer"

rule which in broad terms holds that the collective knowledge of law enforcement cooperating in criminal investigations is imputed to each member. *United States v. Mathis,* 357 F.3d 1200, 1205 (10th Cir.2004); *State v. Peterson,* 739 So.2d 561, 564–66 (Fla.1999) (and cases cited therein); *United States v. Taylor,* 162 F.3d 12, 18 (1st Cir.1998); and *Jandro v. State,* 781 P.2d 512, 518–19 (Wyo. 1989). The "fellow officer" rule obviates the need for either affiant Young or FBI Agent Wilson to have personal knowledge of the informant's reliability, as the knowledge of other law enforcement officers with whom the informant dealt is imputed to them.

[¶ 20] We next move to the third category, which comprises paragraphs six, seven, and thirteen through fifteen of the affidavit, and consider Rohda's contentions about the hearsay evidence of other law enforcement officers. In paragraph six, affiant Young states that DCI Intelligence Analyst Al Ehrhardt researched Rohda's background and learned that he came from and still had family ties in Wisconsin; moved in July 2001 to Buffalo, Wyoming, where he established an Amish and Mennonite furniture business. In paragraph seven, affiant Young states that Analyst Ehrhardt on January 25, 2001, spoke to and received information from Wisconsin DCI Narcotics Agent Dean Nickles about Rohda's very large marijuana grow and sales operation in Wisconsin. Rohda complains that affiant Young is not the person who discovered this evidence and that the Nickles–to–Ehrhardt–to–Young evidence is unsubstantiated and there is no confirmation that the Wisconsin Rohda and the Wyoming Rohda are one and the same person. Responding to Rohda's complaints, the State contends that the "fellow officer/collective knowledge" rule applies here. We agree. Because Ehrhardt and Nickles are law enforcement officers, the law presumes they are truthful or reliable. The information provided by Nickles to Ehrhardt contains "self-verifying detail," which fulfills the basis-of-knowledge requirement. Ehrhardt's knowledge is imputed to affiant Young. As Professor LaFave reminds,

> [c]learly, the fellow officer rule is applicable to situations involving all modes of communication, including computer, radio, telephone, teletype, and face-to-face contact. It governs whether the communication is from a superior or fellow officer within the department, between different agencies or agencies at different levels within a state, between officials in different states, and also between federal and state or local authorities.

LaFave, *supra,* § 3.5(b), at 277–78 (footnotes omitted).

[¶ 21] Finally, Rohda's contention that there is no "confirmation" that the Wisconsin Rohda is the Wyoming Rohda fails because the warrant-issuing judicial officer does not measure the evidence in the affidavit by standards such as beyond a reasonable doubt or by a preponderance; instead, the measure is simply more than a mere suspicion yet not prima facie.

[¶ 22] In paragraphs thirteen through fifteen, affiant Young states that on April 18, 2002, Special Agent Williams was in the area of Rohda's furniture business and saw a red Ford truck with license plates 16–4231; on that same day affiant Young learned from registration records that the red Ford truck was registered to Rohda whose address was 57 Foothills Lane, Buffalo, Wyoming; on that same day Williams and Young obtained from law enforcement records and the telephone company Rohda's home telephone number; and on that same day Williams and another peace officer, Deputy Kozisek, learned from Mahoney's Storage that Rohda rented unit number 109. About this information, Rohda asserts that it is innocuous general information that could be confirmed on any Wyoming citizen and, more importantly, raises no degree of suspicion that Rohda is engaged in criminal activity. While these assertions are correct when this evidence is considered in isolation from the information found in the other substantive paragraphs, it is also to be remembered that the warrant-issuing judicial officer may not consider evidence piecemeal, divorced from the totality of the material evidence revealed elsewhere in the affidavit. It remains for that judicial officer to consider in what ways and to what extent such innocuous general information ties in with the other material evidence in the

affidavit. In this instance, the warrant-issuing judicial officer may find that this evidence combines with evidence from the confidential informants to assist the probable cause determination.

■ [¶ 23] We now move to Rohda's contentions about the information supplied by affiant Young found in the fourth category which comprises paragraphs eight, ten, eleven, and parts of thirteen and fourteen. These paragraphs contain affiant Young's firsthand knowledge about Rohda and Mitchell obtained from official records on April 18, 2002, the day he signed his affidavit. About Rohda, he learned of his date of birth, driver's license number, registration of a red Ford truck, home address, home phone number, brief physical description, and social security number. About Mitchell, he learned of his arrest a month earlier in Campbell County, Wyoming, for driving under the influence and possession of marijuana and cocaine; date of birth, driver's license number, and social security number. Rohda dismisses the significance of this evidence, characterizing it as mundane personal information that is available as to any Wyoming citizen and does not point to any criminal activity on Rohda's part. In response, the State asserts that this evidence becomes significant when combined with other evidence in the affidavit, especially that which identifies Mitchell as a user, buyer, and distributor of controlled substances and as being a companion of Rohda's and being "high" with him on April 18, 2002, in Rohda's red Ford truck and in possession of marijuana and methamphetamine. We agree with the State's valid point. It is generally recognized that among the numerous circumstances that a warrant-issuing judicial officer may rightly consider in making the probable cause determination are a drug suspect's previous drug-related activities and associations with other known drug dealers. *See, e.g., Bornschlegal v. State,* 156 Md.App. 322, 846 A.2d 1090, 1094–95 (2004); *United States v. Burton,* 288 F.3d 91 (3rd Cir.2002); *United States v. Whitner,* 219 F.3d 289 (3d Cir.2000); *State v. Damron,* 575 N.W.2d 912 (N.D.1998); *United States v. Taylor,* 985 F.2d 3, 6 (1st Cir.1993); *Malcolm v. State,* 314 Md. 221, 550 A.2d 670, 675 (1988); and

*State v. O'Neill,* 208 Mont. 386, 679 P.2d 760, 764 (1984).

■ [¶ 24] Next we move to the first category and Rohda's contentions about the information supplied by affiant Young in paragraphs one through four and sixteen which contain not only his firsthand knowledge of his peace officer employment, training, experience, and how controlled substance traffickers/distributors operate, record, and maintain their criminal activities, but also his opinions, based on the evidence in the affidavit, that he has probable cause to believe that at Rohda's residential property, among other specific locations, will be found controlled substances, including marijuana and methamphetamine, and other evidence of controlled substance criminal activity. Rohda has only brief comments about affiant Young's employment, training, experience, drug trafficking knowledge, and probable cause opinion. Rohda acknowledges that a law enforcement officer's experience and expertise are factors that may be considered in the probable cause determination, but contends they have less validity than other factors. He correctly states that the warrant-issuing judicial officer "cannot rely simply on the extensive expertise of a trained narcotics officer," but must consider additional evidence. He then dismisses affiant Young's probable cause opinion as "conclusory." The State does not respond specifically to these comments; however, the results of this Court's own research on these points raised in Rohda's comments make it clear that affiant Young's employment history, training, experience, drug trafficking knowledge, and probable cause opinion are properly included in the several circumstances the warrant-issuing judicial officer should take into consideration. *See, e.g., Mathis,* 357 F.3d at 1205; *Burton,* 288 F.3d at 99, 105; *Cordova v. State,* 2001 WY 96, ¶ 16, 33 P.3d 142, 149 (Wyo.2001); *Lee v. State,* 2 P.3d 517, 523 (Wyo.2000); *United States v. Glover,* 104 F.3d 1570, 1576–78 (10th Cir.1997); and *Taylor,* 985 F.3d at 6. As stated in *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981):

[T]he essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account.

* * * *

The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person.

The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

[¶ 25] Based on the evidence he collected and then set forth in this affidavit, affiant Young, versed in the field of law enforcement and in particular the modes and patterns of operation of drug traffickers/distributors, drew inferences, made deductions, and arrived at an opinion that Rohda was engaged in drug trafficking and distribution and that evidence of that criminal activity would be found on his residential property. Law enforcement officers and warrant-issuing judicial officers use the deductive approach, based on objective facts and reasonable inferences, to find a connection between observed and documented drug activity by known drug dealers and the likelihood that drugs or other evidence of drug law violations may be found on the defendant's residential property. In the words of one court,

[t]he reasoning, supported by both experience and logic, is that, if a person is dealing in drugs, he or she is likely to have a stash of the product, along with records and other evidence incidental to the business, that those items have to be kept somewhere, that if not found on the person of the defendant, they are likely to be found in a place that is readily accessible to the defendant but not accessible to others, and that the defendant's home is such a place.

Direct evidence that contraband exists in the home is not required for a search warrant; rather, probable cause may be inferred from the type of crime, the nature of the items sought, the opportunity for concealment, and reasonable inferences about where the defendant may hide the incriminating items.

*Holmes v. State*, 368 Md. 506, 796 A.2d 90, 100 (2002); *accord, United States v. Whitner*, 219 F.3d 289 (3d Cir.2000) (citing numerous cases); and *State v. Damron*, 575 N.W.2d 912 (N.D.1998).

[¶ 26] Having now unpacked the affidavit and examined the parties' contentions about the substance of the evidence contained therein in light of the applicable law, we are ready to decide the issue presented. In summary, the district court commissioner who issued the search warrant for Rohda's residential property appropriately considered these circumstances: Rohda had been a major participant in a very large marijuana growing and selling operation in Wisconsin; Nathan Mitchell was a known user, possessor, and distributor of drugs such as cocaine and marijuana in the Story–Buffalo–Gillette area; Rohda had a business and residential property in Buffalo and owned a red Ford truck; on April 17, 2002, the day before Special Agent Young applied for the search warrant, Rohda and Mitchell, having returned from a trip to Wisconsin where Rohda had family ties and had been involved in a very large marijuana growing and selling operation, were riding in Rohda's red Ford truck, went to Mahoney's storage unit where Rohda rented storage unit number 109, were in possession of ten pounds of marijuana and four ounces of methamphetamine, and were high; Rohda's residential property is located at 57 Foothills Lane, Buffalo, Wyoming; based on the above and foregoing evidence, Special Agent Young, who is well-versed in the drug law enforcement field, has formed an opinion that Rohda is engaged in drug business criminal activity and that drugs,

drug business records, and other evidence incidental to such criminal activity will be found at Rohda's residential property at 57 Foothills Lane, Buffalo, Wyoming.

[¶ 27] Based on his consideration of this whole picture—the totality of the circumstances—the district court commissioner had a substantial basis for his practical, common sense determination that there was a fair probability that Rohda was engaged in criminal drug business activity and that evidence of that activity would be found on Rohda's residential property. We so hold, and we affirm his conviction and sentence and remand to the district court for further proceedings consistent with this opinion.

VOIGT, C.J., files a specially concurring opinion.

VOIGT, Chief Justice, specially concurring.

[¶ 28] I concur. I write separately only because, as was pointed out in *In re TJS v. State*, 2005 WY 68, ¶ 9 n. 1, 113 P.3d 1054, 1057 n. 1 (Wyo.2005), our case law concerning the standard for reviewing probable cause determinations in the search warrant context is inconsistent, and I do not believe we should continue to cite the cases that reflect that inconsistency. In juxtaposing the two standards—*de novo* review and deferential review—in *Cordova v. State*, 2001 WY 96, ¶¶ 10–11, 33 P.3d 142, 147–48 (Wyo. 2001), we very nearly recognized their incompatibility, but in the end, blessed them both. But, "*de novo* with deference" just does not make sense. In fact, the two concepts are polar opposites.

[¶ 29] I believe it is time to say directly that "deference," as defined by the federal cases, is the appropriate standard of review under either constitution, and that we are not applying *de novo* review of search warrant affidavits for probable cause, contrary to what we said in *In re TJS. See United States v. Sims*, 428 F.3d 945, 954 (10th Cir.2005); *United States v. Soderstrand*, 412 F.3d 1146, 1152–53 (10th Cir.2005), *cert. denied,* —— U.S. ——, 126 S.Ct. 1478, 164 L.Ed.2d 249 (2006); *United States v. Tuter*, 240 F.3d 1292, 1295 (10th Cir.2001); and 6 Wayne R. LaFave, *Search and Seizure* § 11.7(c), at

451–56 (4th ed. 2004) (Supp.2006). Our intent, as we apply these constitutional provisions, is to give guidance to law enforcement officers and issuing magistrates. That goal is best served by establishing and sticking to the standard of review the majority espouses *sub silentio* today: The duty of reviewing courts is simply to ensure that the warrant-issuing judicial officer had a substantial basis for concluding that probable cause existed. It goes without saying, of course, that such substantial basis must have been contained within the four corners of the affidavit presented with the requested warrant.