2006 WY 162

Susan Kaye **CRACKENBERGER,**
Appellant (Defendant),

v.

The **STATE** of **Wyoming,**
Appellee (Plaintiff).

No. 05–192.

Supreme Court of Wyoming.

Dec. 28, 2006.

466

Representing Appellant: Kenneth M. Koski, State Public Defender; Donna D. Domonkos, Appellate Counsel; Diane Courselle, Defender Aid Program Director; Suzannah B. Gambell, Student Intern; and Skip S. Reynolds, Student Intern. Argument by Mr. Reynolds.

Representing Appellee: Patrick J. Crank, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Matthew D. Obrecht, Student Intern; and Mackenzie Williams, Student Intern. Argument by Mr. Williams.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

VOIGT, Chief Justice.

[¶ 1] Susan Crackenberger ("the appellant") pled guilty to one count of child endangerment for permitting a child to remain in a dwelling wherein methamphetamine was possessed, stored, or ingested. On appeal, she argues that the district court erred when it denied her motion to suppress the evidence law enforcement seized from her home. We affirm.

## ISSUE

[¶ 2]   Whether the district court erred in denying the appellant's motion to suppress evidence because the information provided by named informants was unreliable, had no basis of knowledge, or was stale.

## FACTS

[¶ 3]   Law enforcement officers in Sheridan, Wyoming, executed a search warrant at the appellant's home on November 4, 2004. During the search, the officers found methamphetamine residue as well as other methamphetamine-related paraphernalia. The appellant was subsequently charged with one count of possession of a controlled substance, a misdemeanor, in violation of Wyo. Stat. Ann. § 35–7–1031(c)(i) (LexisNexis 2005)[1] and, because a minor child was living in the home at the time, one count of endangering a child, a felony, in violation of Wyo. Stat. Ann. § 6–4–405(b) (LexisNexis 2005).[2]

[¶ 4]   The appellant's daughters provided most of the information that led to the issuance of the search warrant. For clarity and confidentiality, we will refer to the daughters, from oldest to youngest, as D1, D2, D3, and D4. The appellant filed a motion to suppress the items law enforcement seized while searching her home, but the district court denied that motion. The appellant then entered a conditional guilty plea based on a plea agreement, which agreement required the State to dismiss the methamphetamine possession charge and allowed the appellant to appeal the district court's denial of her suppression motion. The instant appeal followed.

## STANDARD OF REVIEW

[¶ 5]   As we said in *Rohda v. State,* 2006 WY 120, ¶ 4, 142 P.3d 1155, 1158 (Wyo.2006):

1. Wyo. Stat. Ann. § 35–7–1031(c)(i) states, in pertinent part:
   (c) It is unlawful for any person knowingly or intentionally to possess a controlled substance ... except as otherwise authorized by this act. Any person who violates this subsection:
   (i) And has in his possession a controlled substance in the amount set forth in this paragraph is guilty of a misdemeanor punishable by imprisonment for not more than

The duty of reviewing courts is simply to ensure that the warrant-issuing judicial officer had a substantial basis for concluding that probable cause existed. As both our Court and the United States Supreme Court have recognized, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants. *See, e.g., [Massachusetts v.] Upton,* 466 U.S. [727,] 732–33, 104 S.Ct. [2085,] 2088, 80 L.Ed.2d 721 [ (1984) (per curiam) ]; [*Illinois v.] Gates,* 462 U.S. [213,] 236, 103 S.Ct. [2317,] 2331, 76 L.Ed.2d 527 [ (1983) ]; *Page [v. State,* 2003 WY 23], ¶ 9, 63 P.3d [904,] 909 [ (Wyo.2003) ]; *and Davis v. State,* 859 P.2d 89, 94 (Wyo.1993).

## DISCUSSION

■   [¶ 6]   Patrick Raymond ("the affiant"), a controlled substance investigator with the Wyoming Division of Criminal Investigation, submitted the search warrant affidavit at issue in the instant appeal, which reads, in pertinent part:

On Tuesday, October 12, 2004, the Affiant received a report from the Wyoming Department of Family Services (DFS), Sheridan Office. The report was regarding a welfare check at the home of Alan and Susan CRACKENBERGER.... [D1], not living in the home; contacted Janette Mydland, a caseworker at the DFS office in Sheridan, and requested a welfare check on her two sisters, [D4 and D3], who still reside in Alan and Susan's home.... [D1] reported to Janette Mydland, that her parents, Alan and Susan use methamphetamine in the home, and the use is getting worse. [D1] and her other sister, [D2], not living in the home, are concerned that Alan and Susan are going to begin manufacturing methamphetamine in the home. The

twelve (12) months, a fine of not more than one thousand dollars ($1,000.00), or both.

2. Wyo. Stat. Ann. § 6–4–405(b) states:
   (b) No person having the care or custody of a child shall knowingly and willfully permit the child to remain in a room, dwelling or vehicle where that person knows that methamphetamine is possessed, stored or ingested.

parents have began constructing a glass globe with glass tubes coming out of the globe. [D1] reported that Susan makes a weekly trip to South Dakota with a friend. [D1] suspects this is how Susan and Alan are obtaining their methamphetamine. [D1] stated that Danny Dayton and Brandy Popp go to the house often and all of the adults go into a bedroom and remain there for long periods of time. [D1] reported that her parents fight continuously, throwing and breaking items in the house when they fight.

On Tuesday, November 2, 2004, the Affiant checked criminal histories on Brandy Popp and Danny Dayton. Danny Dayton was convicted of Misdemeanor Possession of a Controlled Substance in Campbell County Wyoming, on May 5, 1998.

On Wednesday, October 20, 2004, the Affiant arranged to meet with Janette Mydland of DFS, and conduct a telephonic interview with [D1], who resided in Baggs, Wyoming. [D1] reported to the Affiant essentially the following:

[D1] began the interview by saying her mother, Susan CRACKENBERGER and step-father Alan CRACKENBERGER, both use methamphetamine and don't take care for [sic] her two siblings, [D4 and D3]. About five (5) years ago, [D1] discovered snort tubes, mirrors with suspected methamphetamine residue and razor blades around the house.

[D1] knows that Susan takes weekly trips, every Sunday or Wednesday, with Kathy HART, to Whitefish, South Dakota. The two women leave in the afternoon and return late night/early morning. Danny Dayton and his girlfriend, Brandy Pop[p], go to Susan and Alan's house frequently. When all adults are in the house they lock themselves away in a room for long periods of time. [D1] told the Affiant that pornography can be located all over the house and is commonly looked at while [D4 and D3] are present.

The most recent time [D1] has seen methamphetamine or paraphernalia in the house was this past May, 2004. [D1] came to town to attend [D2's] graduation from high school. [D1] was at Alan and Susan's house for a short period of time. While in the house, [D1] saw a small mirror in the bathroom, with what she described as a whitish powder residue on the mirror. The residue left on the mirror was in the shape of several lines. There were also razor blades kept next to the mirror.

[D1] told the Affiant that her youngest sister, [D4] would be willing to tell the truth about what was going on in the house because she is scared but [D3], the oldest of the two sisters living in the home, was very protective of her mother and would be apprehensive about talking with law enforcement.

On Wednesday, October 20, 2004, the Affiant and Special Agent Mike Gale, spoke with [D2], who was working at the Sheridan Wal Mart. [D2] told the Affiant and Special Agent Gale substantially the following:

About two years ago, [D2] attended "biker dress up day" at her school. [D2] borrowed her mother's leather coat to wear to school. While at school, [D2] found a small amount of white powder wrapped in newspaper in her mother's coat pocket. [D2] did not report what she had found to anyone and threw away the white powder. [D2] did not say anything to her mother about the incident.

[D2] suspected her parents began using methamphetamine during her junior year of high school. She noticed a drastic change in their behavior. Susan and Alan stopped attending any school functions and began fighting more than what was normal. [D2] said they fought as frequent as six (6) days per week. [D2] said her father, Alan, finished the basement portion of the house and wanted the kids to spend most of there [sic] time downstairs. Susan and Alan would put the kids on a "guilt trip" much of the time. [D2] said she and her sisters were not physically abused, but believes they were verbally abused. [D2] now knows that the household bills aren't getting paid, which is why the house had recently been auctioned.

[D2] recalled seeing small mirrors and razor blades laying around in strange places of the house, including the bath-

room and the night stand in Susan's bedroom. Susan's appearance has also taken a change for the worse. [D2] has noticed sores appear on her mom's face and said Susan could be the "poster child" for methamphetamine abuse. [D2] related her mother[']s appearance to the "meth make over" bill boards seen along roadways.

About eight (8) months ago, while [D2] was in her parents['] house, she saw a "glass globe with glass tubes sticking out", sitting on the living room table. [D2's] mother told [D2] that it was a Humming Bird feeder. [D2] knew her mother was lying, knowing what a humming bird feeder looks like. She said the tubes sticking out of the globe looked like they were melted into the globe because of the brown burned look where the tubes attached to the globe. [D2] said about two months ago she noticed that her father had boarded up the windows of the garage.

On Thursday, October 28, 2004, the Affiant met with Lori Horton at Janette Mydland's office. Lori went to Janette's office because Lori was concerned about Susan and Alan's children, [D3 and D4]. While speaking with Lori, Lori told the Affiant that she was very aware of the domestic disputes that Susan and Alan have. Lori used to be fairly good friends with Susan until Lori became aware of Susan's drug use. Susan now does not communicate with Lori much. About two (2) months ago, Susan brought a bag containing clothes and other personal items to Lori's house. Susan told Lori that she wanted to leave the bag there in case Susan had to leave her house suddenly because of all the fighting Susan and Alan do. While Lori had the bag at her house, Lori found a small vial with white powder residue and a snort tube in the bag. Lori described the vial to be about 1½ inches tall and clear with a black top. Shortly after Lori found those items, she asked that Lori [sic] come take her bag back. Lori said that this past summer, Susan admitted to Lori that Alan had been using methamphetamine in their house.

On Friday, October 29, 2004, [D2] spoke with the Affiant on the telephone. [D4] had spent the night with [D2], and [D2] talked to [D4] about the living conditions at her parents['] house. [D4] told [D2] that recently when people show up to the house, Susan and Alan go into the new computer room of the house, barricade the door and remain there for long periods of time. [D4] knows they barricade the door because there is no lock on the door and when she had tried to get in the room, there was something in front of the door blocking entry. [D4] said that there are still mirrors and razor blades in her parent[s'] bedroom on the night stand and in the bathroom. Susan always has bruises on her body and tells [D4] that they come from her dad, Alan. Susan and Alan aren't home much of the time[;] when they are home, [D4 and D3] spend most of the time in the basement away from Susan and Alan. [D4] said that Susan never cooks meals[.] When [D4 and D3] aren't in school, and have school lunches, [D4 and D3] eat cereal and pop tarts most of the time because Susan does not make any meals.

Based on your affiant's training and experience, along with information shared with the affiant by other agents, it is known that those involved in the use of methamphetamine and other illegal powder drugs commonly use mirrors and razor blades to cut and prepare the drugs for ingesting. Your affiant also knows from experience that those who commonly use methamphetamine, or other powder drugs, often times store and/or carry their drugs in small glass vials which are easily concealed on their person. Your affiant also knows from experience that those who use methamphetamine, or other powder drugs, often ingest the drugs by using straws commonly referred to as "snort tubes".

Based on your affiant's training and experience, along with information shared with the affiant by other agents, substance abuse counselors and other professionals involved in the substance[ ] abuse field, that people involved in the chronic and frequent use of methamphetamine often times have open sores on their skin, exhibit signs of significant weight loss, are emotionally unstable and become so consumed

by their desire to use the drug that they neglect their daily responsibilities, such as personal hygiene, the care of their children and other household responsibilities.

Based upon the given information, Your Affiant has probable cause to believe that Susan and Alan Crackenberger have been, and still are, involved in the use of controlled substances, and that at [their home], is evidence that will show that a crime was and still is being committed. That evidence being[:] 1) controlled substances to wit:[ ] Methamphetamine[;] 2) pipes, vials, razor blades, mirrors, "snort tubes", plastic baggies and other paraphernalia commonly used in consumption of and/or storage of methamphetamine and other illegal drugs[;] 3) records, receipts, notes, ledgers, address/telephone books and other papers relating to the purchase of controlled substances and/or the identity of the source supply.

Further, your affiant Sayeth not.

[¶ 7] We have often repeated that, because our state constitution requires an affidavit establishing probable cause before a search warrant is issued, Wyoming offers its citizens stronger protections against search and seizure than the United States Constitution. *Hixson v. State*, 2001 WY 99, ¶ 5, 33 P.3d 154, 156 (Wyo.2001). However, like the United States Supreme Court, we have stressed that a judicial officer must ultimately come to a "practical, common-sense decision" when determining whether probable cause exists to issue a search warrant. *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983); and *Rohda*, ¶ 6, 142 P.3d at 1159.

The judicial officer who is presented with an application for a search warrant supported by an affidavit applies a "totality of circumstances" analysis in making an independent judgment whether probable cause exists for the issuance of the warrant. *See, e.g., Page*, ¶ 9, 63 P.3d at 909; *Upton*, 466 U.S. at 732, 104 S.Ct. at 2087; and *Bonsness [v. State]*, 672 P.2d [1291,] 1293 [ (Wyo. 1983) ]. In making that independent judgment, the judicial officer is limited to the four corners of the supporting affidavit. *Page*, ¶ 9, 63 P.3d at 909.

The "totality of circumstances" analysis requires the judicial officer simply "to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238, 103 S.Ct. at 2332; *see Bonsness*, 672 P.2d at 1293.

*Rohda*, ¶ 5, 142 P.3d at 1158–59.

[¶ 8] Where an affidavit relies heavily on the hearsay statements of third parties, we have said:

As in the case of the primary source affiant, so in the case of the secondary source person, the judicial officer must know both that person's veracity or reliability and basis of knowledge. Because the secondary source person is not before the judicial officer and has not taken an oath, the judicial officer must have a reasonable substitute for an oath in order to be satisfied with the veracity or reliability of the secondary source person.

*Id.*, ¶ 8, 142 P.3d at 1159.

[¶ 9] In the instant case, the appellant first argues that the district court erred in denying her motion to suppress because the informants relied upon in the affidavit-D1, D2, and Ms. Horton—were not sufficiently reliable and the basis of their knowledge was not clearly stated. The State responds that the judicial officer who issued the search warrant had a substantial basis for concluding that probable cause existed and, therefore, the district court did not err in denying the motion to suppress.

[¶ 10] Unlike the majority of our suppression cases, the informants in the instant case are all identified citizen informants. "Courts ordinarily deem citizen informants, in contrast to police informants, to be presumptively reliable sources of information." *Borgwardt v. State*, 946 P.2d 805, 807 (Wyo.1997). We have said that this presumption attaches, in part, because by identifying oneself, an informant is exposed "to possible criminal and civil prosecution if the

report is false." *McChesney v. State*, 988 P.2d 1071, 1076 (Wyo.1999). Beyond this presumption of reliability, we also note that the three informants in this case spoke with DFS and law enforcement out of a concern for the well-being of the appellant's minor children and each informant also gave independent information that corroborated the statements of the other informants. While the appellant correctly argues that reliability of informants alone does not establish probable cause to issue a search warrant, we note that the informants in the instant case appear to be reliable and that is an important factor that we weigh in examining the "totality of the circumstances."

[¶ 11] An equally important factor is an informant's basis for the knowledge he or she provides law enforcement. "[T]he affiant's affidavit must contain the raw data of that person's sense perception—what that person saw, heard, or smelled firsthand. It is from that secondary source's firsthand knowledge that the judicial officer will be able to draw conclusions about the existence or not of probable cause." *Rohda*, ¶ 8, 142 P.3d at 1160.

[¶ 12] The affidavit in the instant case established that the citizen informants had sufficient first-hand knowledge of the appellant's criminal activities to justify issuing a search warrant. The information that established probable cause is as follows:

- Five years before, D1 discovered snort tubes, mirrors with suspected methamphetamine residue, and razor blades in the appellant's house.
- Six months prior to the search warrant in the instant case, D1 saw a small mirror in the bathroom with white powder residue in the shape of several lines and also saw razor blades nearby.
- Two years prior, D2 found a small amount of white powder wrapped in newspaper in the appellant's jacket.
- D1 and D2 both reported drastic changes in the appellant's behavior in the years before the search warrant was issued. She began fighting with her husband more frequently, the couple expected their children to remain in the basement much of the time, and they became delinquent on their household bills.
- D2 noted that she saw razor blades and small mirrors around the house, including in the bathroom and the appellant's bedroom.
- D2 also told the affiant that her mother's appearance had deteriorated and she could be the " 'poster child' for methamphetamine abuse."
- Ms. Horton reported that she was aware of the appellant's domestic arguments and that the appellant had asked her to keep a bag of clothes and personal items in case the appellant needed to flee her home on short notice. After taking possession of the bag, Ms. Horton found a vial with white powder residue and a "snort tube" therein.
- Sometime during the summer prior to the execution of the search warrant, the appellant admitted to Ms. Horton that her husband had been using methamphetamine in the house.
- Finally, D4 relayed the following information to D2: (1) her parents would barricade themselves in a room for long periods of time with guests; (2) mirrors and razor blades could still be found in the bathroom and her mother's bedroom; (3) her mother has bruises on her body from her father; and (4) the two daughters still living at home are forced to eat cereal and pop tarts because the appellant does not prepare food for them.

[¶ 13] Under the "totality of the circumstances" approach, we find this information, when combined with the high degree of reliability of the informants and the experience and knowledge of the affiant, sufficient to establish probable cause that methamphetamine and methamphetamine paraphernalia would be found in the appellant's home. The appellant's arguments that the informants have no specialized knowledge of methamphetamine and that there are other explanations for the appellant's change in behavior are also not well received. While the informants may not have specialized knowledge of controlled substances and drug-related behavior, the affiant in the instant case did have such knowledge and properly applied it

to the first-hand observations from the informants. The affiant's knowledge and training, combined with the informants' first-hand knowledge, was sufficient to provide the judicial officer with a substantial basis for concluding that probable cause existed in the instant case to search the appellant's home.

[¶ 14] The appellant also argues that the information contained in the search warrant affidavit was insufficient to establish probable cause because it was stale. We agree with the State that the information contained in the affidavit was current enough for the judicial officer to issue the search warrant.

> The general rule is that the facts and circumstances set forth in an affidavit submitted in support of the issuance of a search warrant should be current and timely so as to indicate that the premises, person, place, or thing to be searched presently contains the fruits or evidence of the crime.

*Cordova v. State*, 2001 WY 96, ¶ 21, 33 P.3d 142, 150 (Wyo.2001).

Generally, "timeliness depends on the 'nature of the criminal activity, the length of the activity, and the nature of the property to be seized.'" *Id.* at ¶ 19, 33 P.3d at 150 (quoting *Guerra v. State*, 897 P.2d 447, 454 (Wyo.1995)). In the instant case, however, we need not delve too deeply into the preceding factors because the appellant's argument on appeal ignores the information provided to law enforcement from D4, which information indicated that during the previous week,

her parents' behavior had continued to worsen and razor blades and mirrors could still be found around the house. The information from D4 is significant because, when viewed in light of the other information contained in the affidavit, it tended to indicate that the appellant had been using methamphetamine for as many as five years, and there was probable cause to believe that the use was continuing up to the time when the search warrant was issued.

## CONCLUSION

[¶ 15] Applying the "totality of the circumstances" test to the information contained in the search warrant affidavit, the judicial officer did not err in concluding that probable cause existed to issue the search warrant. The informants were sufficiently reliable and demonstrated a basis for their knowledge of the appellant's criminal activities; further, the information demonstrated that there was probable cause to believe that the appellant's methamphetamine use was continuing at the time the search warrant was issued, therefore, the information was not stale.

[¶ 16] Affirmed.